UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────────

CARSUNDRA RIDGEWAY, Administrator of the
estate of her deceased daughter, Sahlah Ridgeway,

                    Plaintiff,

v.                                                          5:16-CV-0618
                                                            (GTS/ATB)
CITY OF SYRACUSE; DARRIN ETTINGER,
Police Officer; JEREMY DECKER, Police
Officer; and JOHN DOES,

                    Defendants.
─────────────────────────────────────────────

APPEARANCES:                                        OF COUNSEL:

CARSUNDRA RIDGEWAY
  Plaintiff, *Pro Se*
909 Short Street
Burlington, NC 27217

HON. KRISTEN E. SMITH                               CHRISTINA F. DeJOSEPH, ESQ.
Corporation Counsel for City of Syracuse
  Counsel for Defendants
233 East Washington Street
City Hall, Room 300
Syracuse, NY 13202

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this wrongful death action filed by Carsundra Ridgeway

("Plaintiff") against the City of Syracuse, Police Officers Darrin Ettinger and Jeremy Decker,

and John Does ("Defendants"), is Defendants' motion for summary judgment.  (Dkt. Nos. 52.)

For the reasons set forth below, Defendants' motion for summary judgment is granted.

# I.      RELEVANT BACKGROUND

## A.      Plaintiff's Complaint

Generally, in her Complaint, Plaintiff asserts eight causes of action.  (Dkt. No. 1 [Pl.'s

Compl.].)  First, Plaintiff alleges that Defendants engaged in excessive, unreasonable, and deadly

force against decedent Sahlah Ridgeway ("Sahlah") in violation of the Fourth and Fourteenth

Amendments of the United States Constitution by shooting Sahlah multiple times on February

12, 2016, and dragging her through the snow.  (*Id.* at ¶¶ 33-40.)

Second, Plaintiff alleges that Defendants committed common law battery against Sahlah

in violation of New York law by shooting her multiple times and dragging her through the snow.

(*Id.* at ¶¶ 41-47.)

Third, Plaintiff alleges that Defendants committed common law assault against Sahlah in

violation of New York law by intentionally placing her in apprehension of imminent harmful and

offensive contact.  (*Id.* at ¶¶ 48-51.)

Fourth, Plaintiff alleges that Defendant City of Syracuse violated Plaintiff's rights by

negligently entrusting Defendants Ettinger and Decker with firearms and a license to carry

firearms in violation of New York law because Defendant City of Syracuse knew or should have

known of the violent, reckless, hazardous, or otherwise dangerous nature of Defendants Ettinger

and Decker.  (*Id.* at 52-59.)

Fifth, Plaintiff alleges that Defendant City of Syracuse violated Plaintiff's rights under

New York law by negligently hiring, training, or retaining Defendants Ettinger and Decker.  (*Id.*

at ¶¶ 60-63.)

Sixth, Plaintiff alleges that Defendant City of Syracuse is liable for Sahlah's wrongful death under New York law because her death was caused entirely by the negligent, reckless, and intentional behavior of Defendants.

Seventh, Plaintiff alleges that Defendant City of Syracuse should be held liable under 42 U.S.C. §§ 1983 and 1988 for the actions of Defendants Ettinger and Decker pursuant to a theory of municipal liability because Defendant City of Syracuse has a *de facto* policy of tolerating the abuse and use of excessive force against members of the African-American community. (*Id.* at ¶¶ 68-77.)

Eighth, Plaintiff alleges that Defendants denied Sahlah timely and adequate medical care in violation of the Due Process Clause of the Fourteenth Amendment by being deliberately indifferent to her serious need for prompt medical attention following the shooting; specifically, Plaintiff alleges that (a) Defendants brought Sahlah to a hospital that was not the closest hospital to the scene of the incident, (b) Defendants dragged her through the snow while she was pleading for her life, and (c) Defendants left Sahlah in the ambulance for an extended period of time before it departed for the hospital. (*Id.* at ¶¶ 78-87.)

## B. Undisputed Material Facts on Defendant's Motion for Summary Judgment

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendant in its Statement of Material Facts. (Dkt. No. 39, Attach. 25 [Def.'s Rule 7.1 Statement].) The Court notes that Plaintiff failed to submit a response to Defendants' Statement of Facts, even though she was specifically advised of the consequences of failing to do so (Dkt. No. 52, Attach. 33.) and was granted an extension of the deadline by which to do so. (Dkt. No. 60.) Instead, she submitted a one-paragraph unsworn statement, which is clearly

insufficient in that it does not deny any of Defendants' factual assertions in matching numbered paragraphs (as is required by N.D.N.Y. L.R. 7.1[a][3]) and it does not constitute admissible record evidence (as required by Fed. R. Civ. P. 56[c][1], [3]).  (Dkt. No. 61.)  The Court has accepted Defendants' Statement of Facts as undisputed where the asserted facts are properly supported.[1]

1.　　　Plaintiff is the administrator of the estate of her only daughter, Sahlah.

2.　　　On February 12, 2016, Sahlah was 32 years old, unmarried, and did not have any children.  She attended Fowler High School, but did not graduate or obtain her GED.

3.　　　In October 2015, Sahlah sought counseling for anger issues.

4.　　　On February 12, 2016, Sahlah had lived in an apartment on Butternut Street in the City of Syracuse for a few months. Plaintiff visited Sahlah that afternoon at Sahlah's apartment from approximately 5:00 p.m. to 6:20 p.m.  When Plaintiff left, Sahlah was the only one in the apartment.

5.　　　Later that evening, Luis Santiago went to Sahlah's apartment; he had met Sahlah approximately two weeks before February 12, 2016.

6.　　　Mr. Santiago visited a friend who lived in apartment 33 in the same building, and, after leaving that friend's apartment, he went down to Sahlah's apartment.

---

[1]　　*See* N.D.N.Y. L.R. 7.1(a)(3) ("The opposing party shall file a response to the Statement of Material Facts.  The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. . . . The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.") (emphasis in original).

4

7.    Mr. Santiago visited Sahlah in her apartment for approximately an hour and a half, during which time Sahlah was "stressing" over personal relationship issues, about which she talked to Mr. Santiago.

8.    In the course of their conversation, Sahlah showed Mr. Santiago two shotguns: one that was all black with a shoulder butt piece on the back, and one that was black and brown without a butt piece on the back.

9.    Sahlah told Mr. Santiago that she "had ideas of going outside and letting off some steam, letting some shots in the air."

10.   When Mr. Santiago and Sahlah left her apartment, she had one of the shotguns "posted in her jacket"; a small portion of the shotgun stuck out of her jacket towards her breast.

11.   According to Mr. Santiago, Sahlah was wearing a "big brown jacket," shorts, flip-flops, and a ski mask when the two of them left her apartment.

12.   When Mr. Santiago and Sahlah went outside toward the back of the apartment building, they encountered two people who saw the shotgun Sahlah was carrying and then went inside.

13.   Sahlah and Mr. Santiago were in the area behind the apartment for at most five minutes before police were to arrive.

14.   Meanwhile, someone called 911 to report a drug complaint at the Kimton Place apartments located at 1313 Butternut Street.  The caller, who identified herself as Shari Bradley, advised the 911 dispatcher that a black male, approximately 22-23 years old and wearing black gloves and a black jacket, was dealing drugs on the third floor of that building.

15. While Officers Ettinger and Decker were patrolling the north side of the City of Syracuse, Officer Decker used channel three on their radio to notify the dispatcher that he and Officer Ettinger would handle the drug complaint at 1313 Butternut Street.

16. Both officers were wearing departmentally issued duty uniforms, including black boots, green cargo pants, and tactical ballistic vests that were clearly marked with the word "POLICE" on the front and back.

17. Additionally, both Officer Ettinger and Officer Decker were familiar with 1313 Butternut Street and the surrounding area. Both officers had responded to that location in a uniformed capacity on multiple occasions before February 12, 2016, and were familiar with the layout of both the interior and exterior of the building.

18. As Officer Ettinger pulled into the parking lot in the marked patrol vehicle at approximately 8:39 p.m., he turned the headlights off and parked the vehicle next to the east side of the apartment building.

19. The officers then exited the patrol vehicle and Officer Ettinger stated that he would take the front of the building, while Officer Decker stated that he would take the back of the building; they did this to prevent anyone from leaving the building without their knowledge so that they could investigate the drug complaint.

20. After they separated, Officer Ettinger approached the front entrance door to the apartment building and walked down two or three steps to access the front door. He pulled on the door and noted that it was locked; however, he was able to see into the first floor of the building through a small window on the front door.

21. When Officer Ettinger looked into the window, he did not see Officer Decker but he did observe an individual standing in the hallway near the laundry room, who went into one of the apartments, after which the hallway was empty.

22. Almost immediately thereafter, Officer Ettinger observed what he believed to be a black male with a large build wearing a black coat and black winter hat exit the west stairwell into the hallway.

23. The individual with a large build was accompanied by a black male with a skinny build wearing a light-colored shirt and dark pants; this individual was later identified as Mr. Santiago.

24. As Officer Ettinger continued to watch the two individuals, he observed the larger individual in the black coat nervously look up and down the hallway several times.

25. This individual, who Officer Ettinger observed acting suspiciously, fit the description of the individual in the drug complaint given by dispatch.

26. Based on those observations, Officer Ettinger believed that the individual with the large build, black coat, and black hat was the subject of the 911 call.

27. This individual would later be identified as Sahlah Ridgeway.

28. Officer Ettinger then observed Sahlah turn and walk toward the back door, followed by Mr. Santiago; Officer Ettinger was unaware that Sahlah had a shotgun concealed in her coat.

29. Meanwhile, Officer Decker approached the rear of the building and walked down to stairs to access the rear door, which was locked.

30. After realizing that the rear door was locked, Officer Decker hurried around to the front along the east side of the building.

31. As Sahlah and Mr. Santiago walked toward the rear door, Officer Ettinger radioed to Officer Decker something to the effect of "two coming to you" because it was his understanding that Officer Decker was outside the rear door.

32. Officer Ettinger's seeing Sahlah and Mr. Santiago and alerting Officer Decker occurred no more than one minute after the officers had arrived on the scene to respond to the drug complaint.

33. As Officer Decker came around the southeast corner of the building, he heard Officer Ettinger's radio transmission.

34. At the same time, Officer Decker saw Officer Ettinger standing at the front door and looking through the glass window of that door.

35. Officers Ettinger and Decker then had a brief exchange in which Officer Decker advised Officer Ettinger that the rear door was locked and Officer Ettinger reiterated that two individuals were heading out the back door.

36. Officer Decker then hurried toward the back of the building in a fast walk or jog along the east side of the building.

37. While Officer Decker returned to the back of the building, Officer Ettinger maintained his position at the front of the building, keeping an eye on the front door window.

38. When Mr. Santiago realized that police were on the scene, he called Sahlah's name and she turned to him, tucking the gun into her shorts to make sure it would not drop.

39.     As Officer Decker started to round the northeast corner of the building, he observed Mr. Santiago standing at the top of the two stairs that led to the rear door; Officer Decker looked at Mr. Santiago's hands and observed that he was not holding anything.

40.     Officer Decker also observed Sahlah (who he believed to be a male at that time) standing further west of Mr. Santiago and with her left side facing Officer Decker; she was wearing all dark clothing and a dark-colored hat.

41.     As soon as Sahlah saw Officer Decker, she started nervously walking away from him very quickly; when she turned to walk away, Officer Decker yelled, "Hey, stop!"

42.     Sahlah then took off running away from Officer Decker toward the west side of the building. After she had taken the first few strides, Officer Decker noticed that she was carrying a shotgun in her right hand that was swinging slightly down by her right side.

43.     According to Mr. Santiago, Officer Decker got on his radio and said, "I think I have a male, I suspect he has a gun," then rushed toward the side of the building to chase after Sahlah.

44.     Officer Decker began chasing Sahlah toward the northwest corner of the building and alongside the west side of the building, during which time Mr. Santiago claims he was running behind Officer Decker.

45.     Mr. Santiago heard Officer Decker yell, "Freeze, drop the weapon" to Sahlah while chasing her.

46.     When Mr. Santiago heard Officer Decker's command, he stopped and turned the other way.

47.     After yelling twice for Sahlah to stop and drop the weapon, Officer Decker drew his departmentally issued firearm and continued chasing her toward the front of the building, where he last knew Officer Ettinger to be standing.

48.     Sahlah did not comply with Officer Decker's commands to stop or drop her weapon.

49.     Instead, Sahlah continued running along the west side of the building toward the front.

50.     As Officer Decker approached the middle of the west side of the building, he re-holstered his handgun and radioed to Officer Ettinger something to the effect of "one coming at you with a weapon."

51.     The time-stamp on that radio communication is 20:41:24 (8:41:24 p.m.)

52.     Officer Ettinger was standing in the front southwest corner of the building when he heard that communication on the radio.

53.     At that time, Officer Ettinger could not determine from which side of the building Sahlah would emerge, so he shifted back toward the center of the building in an attempt to cover both sides.

54.     While doing so, Officer Ettinger heard Officer Decker yell something to the effect of "drop it."

55.     Upon hearing Officer Decker's command, Officer Ettinger knew that Officer Decker was in a foot pursuit with Sahlah along the west side of the building.

Officer Ettinger began moving back toward the southwest corner of the building to assist Officer Decker in apprehending Sahlah.

56.     As Officer Decker approached the front of the building, he observed Sahlah begin to carry the shotgun with two hands.

57.     As Officer Ettinger continued moving to his left toward the southwest corner of the building, the building's exterior lights allowed him to see a shadow that was moving along the west side of the building approaching the front; he could also hear footsteps crunching in the snow.

58.     When Officer Ettinger approached the southwest corner of the building, the first thing he observed was Sahlah.

59.     As Sahlah ran towards Officer Ettinger, he could clearly see that she was holding a sawed-off shotgun or rifle with both hands; her right hand was near the trigger well and her left hand was holding the pump.

60.     Officer Decker observed Sahlah running at Officer Ettinger; as she approached, Officer Decker saw Officer Ettinger open his eyes wide and take several steps backwards.

61.     Officer Ettinger estimated that Sahlah was approximately five feet from him at that time.

62.     Given the close proximity between him and Sahlah, and his fear of the devastation that a shotgun or rifle could have on him, Officer Ettinger shouted something to the effect of "drop it! Drop it!"

63.    He began moving backward to increase the distance between him and Sahlah and drew his departmentally issued firearm.

64.    Sahlah did not comply with Officer Ettinger's command to drop the weapon.

65.    Instead, Sahlah turned toward the parking lot and continued running along the front of the building in an easterly direction holding the weapon with both hands.

66.    Officer Decker continued running eastbound behind Officer Ettinger; he had his flashlight in his right hand and his firearm in his holster on his duty belt.

67.    With his firearm drawn, Officer Ettinger turned to his right to pursue Sahlah on foot because he believed that she would continue running eastbound.

68.    After getting past the front entrance of the building, Sahlah stopped abruptly and turned toward Officers Ettinger and Decker, holding the shotgun with both hands.

69.    Officer Ettinger then observed Sahlah look down at the gun in her hands while attempting to manipulate its safety mechanism.

70.    Upon seeing Sahlah manipulating the safety mechanism of the sawed-off shotgun, Officer Ettinger believed that she was disabling it so that should could shoot him or Officer Decker.

71.    Based on everything Officer Ettinger had observed and heard thus far, including the fact that he and Officer Decker were dealing with an armed, fleeing suspect who had disregarded repeated commands to stop and drop the weapon, and who was now manipulating the gun's safety mechanism, he feared that Sahlah was going to shoot him or Officer Decker, who was in close proximity to her.

72.     He therefore extended his firearm forward with both hands and fired two rounds.

73.     When Officer Decker heard the two gun shots, he observed the shotgun fly from Sahlah's hand, landing closer to the sidewalk than where she was positioned on the ground.

74.     According to Mr. Santiago, he was on the west side of the building, about four or five feet back from the front of the building, when he heard the gunshots.

75.     Mr. Santiago did not see what Sahlah was doing in the seconds immediately before she was shot.

76.     After hearing the gunshot, Mr. Santiago stepped a few feet away from the front corner of the building and began running toward the rear of the building; he did not see the shooting itself.

77.     Officers Ettinger and Decker then immediately approached Sahlah, securing her in handcuffs, and began rendering aid.

78.     After securing Sahlah in handcuffs, Officers Ettinger and Decker began to render first aid by locating the wound and applying direct pressure to it in an attempt to control the bleeding.

79.     They did this without first frisking her for additional weapons.

80.     Within seconds, Officer Ettinger called out over the radio, "Shots fired, officer involved," and then requested an ambulance.

81.     The time-stamp on Officer Ettinger's request for an ambulance (i.e., a "78") occurred at 20:42:10 (8:42:10 p.m.).

82. While Officer Ettinger notified dispatch and continued to render aid to Sahlah, Officer Decker recovered the gun Sahlah had been carrying, which was located a few feet away.

83. As Officer Decker picked up the shotgun, Mr. Santiago emerged from the front door of the building and approached him.

84. Officer Decker asked Mr. Santiago to bring him and Officer Ettinger some towels and scissors.

85. Mr. Santiago seemed to acknowledge Officer Decker's request; he then ran toward the front door of the building and around the east side.

86. Mr. Santiago was outside for no more than 15 seconds during his interaction with Officer Decker.

87. Officer Decker then placed the shotgun Sahlah had been carrying against the side of the building near where Officer Ettinger was rendering aid.

88. While Officers Ettinger and Decker were rendering aid to Sahlah, Officer Decker asked Sahlah why she did not drop the weapon, to which she replied that she was going to test fire it in the back parking lot.

89. Officer Decker asked her if the gun was loaded, to which she replied, "Yes."

90. During this time, Officers Ettinger and Decker pulled up the back of Sahlah's shirt to located the gunshot wounds and apply pressure to them in an attempt to control the bleeding while they waited for the ambulance to arrive.

91. Around the same time, Officer Ettinger heard a radio transmission asking if the officers were okay, to which he responded, "Officers OK, suspect down–two to the back."

92.     The time-stamp on that radio transmission is 20:43:24 (8:43:24 p.m.)

93.     After his brief exchange with Sahlah, Officer Decker noticed two or three people emerge from the front door of the building.

94.     Officers Ettinger and Decker asked the onlookers for scissors, so they could cut Sahlah's clothing to better access the wounds.

95.     It quickly became apparent to both officers that none of the onlookers understood English, so they began making cutting motions with their fingers to convey their need for scissors.

96.     The onlookers did not move or provide the officers with scissors.

97.     Given the fact that Officer Decker had just recovered a loaded shotgun and there were now several onlookers in their presence, Officers Ettinger and Decker decided the shotgun needed to be secured.

98.     Officer Decker then picked up the shotgun from where he had placed it against the side of the building, walked it to the patrol vehicle, and locked it in the trunk.

99.     Officer Ettinger continued to apply pressure to Sahlah's wounds with a towel or blanket during that time.

100.    The safety mechanism on the shotgun was off/disabled (making a red dot visible) when Officer Decker picked it up, as reflected in the photographs.  It was later determined that the shotgun in Sahlah's possession was stolen.

101.    As Officer Decker went to secure the shotgun in the patrol vehicle, several other units began arriving on the scene to assist.

102. During that time, Officer Ettinger observed Mr. Santiago emerge from the front door of the building.

103. Mr. Santiago gave Officer Ettinger a blanket or a towel that Officer Ettinger used to apply pressure to the gunshot wound; Mr. Santiago then ran back in the front door and Officer Ettinger did not see him again.

104. Mr. Santiago was outside for no more than 10 seconds before running back inside.

105. Officer Ettinger continued to ask for scissors to no avail.

106. Then, with the assistance of Officer Ripley (one of the officers who arrived to provide back up) Officer Ettinger held the rear of Sahlah's jacket while Officer Ripley used his pocket knife to cut the clothing and expose her back so that Officer Ettinger could better isolate the gunshot wounds and control her bleeding.

107. Officer Ettinger continued his efforts until Sergeant Novitsky, a certified paramedic, arrived on scene and took over care of Sahlah.

108. The ambulance arrived on scene approximately four minutes after Officer Ettinger radioed his request for the same, and approximately two minutes and 30 seconds after being dispatched at 20:43:58 (8:43:58 p.m.). Sergeant Novitsky turned over Salah's care to Rural/Metro personnel once they arrived on the scene two or three minutes later.

109. Mr. Santiago claims that, after the ambulance arrived, the paramedics dragged Sahlah out of the snow and put her on a stretcher. Neither Officer Ettinger nor Officer Decker moved Sahlah while they were rendering aid to her.

110. Mr. Santiago claims he overheard conversations between the paramedics (not the police officers) regarding the hospital to which they would transport Sahlah. Officer Ettinger was not involved in determining what hospital Sahlah would be taken to, and Officer Decker left the scene before the time the ambulance arrived.

111. Officer Decker did not discharge his departmentally issued firearm on February 12, 2016.

112. Plaintiff is not aware of anything in Officer Ettinger's background before his being hired by the City of Syracuse Police Department that relates to an unreasonable or unlawful use of a firearm.

113. Plaintiff is not aware of anything in Officer Decker's background before his being hired by the City of Syracuse Police Department that relates to an unreasonable or unlawful use of a firearm.

114. Plaintiff is not alleging the City of Syracuse was aware of anything in Officer Ettinger's background, or from any time before February 12, 2016, that would give it reason to believe that he should not have been allowed to carry his departmentally issued firearm.

115. Plaintiff is not alleging that the City of Syracuse was aware of anything in Officer Decker's background, or from any time before February 12, 2016, that would give it reason to believe he should not have been allowed to carry a departmentally issued firearm.

116. Plaintiff is not alleging that the City of Syracuse was aware of specific information about Officer Ettinger or Officer Decker before February 12, 2016, that rendered the possession of their departmentally issued firearms unsafe.

117.    Plaintiff is not aware of any specific incidents involving either Officer Ettinger or

Officer Decker that were particularly violent or hazardous before February 12,

2016.

118.    Plaintiff is not aware of any reason why either Officer Ettinger or Officer Decker

should not have been allowed to carry their respective departmentally issued

firearms before and on February 12, 2016.

**C.    Parties' Briefing on the Defendants' Motion**

**1.    Defendants' Motion for Summary Judgment**

**a.    Defendants' Memorandum of Law**

Generally, in support of their motion for summary judgment, Defendants assert eight

arguments.  (Dkt. No. 52, Attach. 32, at 9-25 [Defs.' Mem. of Law].)  First, Defendants argue

that Plaintiff's claims for use of excessive force, assault, and battery must be dismissed because

the undisputed evidence establishes that the amount of force used was reasonable under the

circumstances.  (*Id.* at 9-13.)  More specifically, Defendants argue that the force used against

Sahlah was reasonable because (a) her appearance was similar to that of the subject of the 911

drug complaint, (b) her observed behavior of looking up and down the hallway of the apartment

building was suspicious to Defendant Ettinger, (c) she ran from the officers almost immediately,

(d) Defendant Decker observed that she had a firearm and was moving nervously away from

him, (e) she ran towards the officers carrying the firearm in both hands and failed to comply with

commands to stop and to drop the firearm, and (f) she turned towards the officers, looked down,

and began manipulating the firearm's safety mechanism.  (*Id.* at 12-13.)  Defendants argue that

these circumstances made it reasonable for Defendant Ettinger to believe that there was a serious

18

threat to his (and Defendant Decker's) safety, which therefore made it reasonable to use deadly force against Sahlah.  (*Id.*)  Defendants additionally argue that, because Plaintiff has not even alleged that Defendant Decker used any unreasonable force against Sahlah, given that Defendant Ettinger was the only officer who fired his gun, the claims against Defendant Decker must also be dismissed for that reason.

Second, Defendants argue that Plaintiff's claim for denial of timely and adequate medical care must be dismissed because the undisputed record establishes that Defendants Ettinger and Decker began rendering medical aid to Sahlah immediately after securing her in handcuffs following the shooting, that Defendant Ettinger called for an ambulance within seconds of the shooting and continued to attempt to staunch Sahlah's wounds until trained personnel arrived, and that the paramedics arrived just over two minutes after being dispatched, at which time they began providing medical care before transporting her to the hospital.  (*Id.* at 14-15.)

Third, Defendants argue that, in the alternative, Defendants Ettinger and Decker are entitled to qualified immunity because, under the undisputed factual circumstances, Defendant Ettinger's split-second decision to shoot was objectively reasonable.  (*Id.* at 15-18.)

Fourth, Defendants argue that Plaintiff's negligent entrustment claim must be dismissed because Plaintiff has not provided evidence that Defendant City of Syracuse possessed any special knowledge about Defendants Ettinger and Decker that rendered those officers' use of departmentally issued firearms unreasonably dangerous.  (*Id.* at 18-19.)

Fifth, Defendants argue that Plaintiff's state law claim for negligent hiring, training, and retaining must be dismissed because (a) she has not adduced evidence to support this claim, and (b) Defendants Ettinger and Decker were acting within the scope of their employment at the time of the events in question.  (*Id.* at 19.)

Sixth, Defendants argue that Plaintiff's wrongful death claim must be dismissed because she has failed to establish that Defendants Ettinger and Decker committed a wrongful act and has failed to submit any evidence supporting her assertion of pecuniary loss, such as documentary proof of funeral expenses. (*Id.* at 20-21.)

Seventh, Defendants argue that the Complaint fails to state a claim upon which relief can be granted against Defendant City of Syracuse pursuant to a theory of municipal liability because (a) Plaintiff's allegations of the existence of a *de facto* policy are all conclusory and unsupported by evidence and (b) Plaintiff has failed to plead any facts that tend to show that a failure to discipline officers for the alleged unconstitutional acts amounted to deliberate indifference. (*Id.* at 23-25.)

Eighth, and last, Defendants argue that, in the alternative, Plaintiff's claims against Defendants Ettinger and Decker in their official capacities should be dismissed because they are merely duplicative of Plaintiff's municipal liability claim against Defendant City of Syracuse. (*Id.* at 25.)

### b.      Plaintiff's Opposition Memorandum of Law

Pursuant to the Court's Text Notice of July 24, 2018, Plaintiff's opposition memorandum of law was due by August 20, 2018. (Text Notice filed July 24, 2018). Plaintiff did not file an opposition memorandum of law or request an extension of the filing deadline by that date.

### c.      Defendants' Reply Memorandum of Law

On August 27, 2018, Defendants filed the declaration of attorney Christina DeJoseph, stating that (a) Defendants' motion for summary judgment and Notification of the Consequences of Failing to Respond to a Summary Judgment Motion were served upon Plaintiff by regular

mail in compliance with the Court's April 17, 2018, text order, and (b) no responsive papers had been received from Plaintiff.  (Dkt. No. 55, at 1-2.)

### d.    Plaintiff's Letter-Request for Extension of Time and Subsequent Filings

On September 14, 2018, Plaintiff filed a letter-request for an extension of time to "get the required information for [her] case."  (Dkt. No. 59.)  The Court granted Plaintiff's request out of special solicitude to her *pro se* status, allowing her until October 15, 2018, to file a response to Defendants' motion, but cautioned her that any request for further extensions should be made before the deadline expires.  (Dkt. No. 60 [Text Order filed Sept. 14, 2018].)  On October 12, 2018, Plaintiff filed a handwritten letter from Vondette Speller, in which Ms. Speller stated that she witnessed the Defendant officers shoot Sahlah multiple times without warning and drag her body into the snow.  (Dkt. No. 61.)  On October 29, 2018, Plaintiff additionally submitted photographs along with a change of address notification on which she asserts that the gun found at the scene was not Sahlah's gun, and that "[Sahlah] was not a danger to []no one, not even herself" and "[t]his is excessive force.  No human should have to die like this."  (Dkt. Nos. 62, 63.)

On January 14, 2019, Plaintiff filed a letter along with photographs of Sahlah holding the shotgun that was known to belong to her and of the shotgun that the police recovered at the scene after the shooting.  (Dkt. No. 64.)  In her letter, Plaintiff argues that these photographs show that it was not Sahlah's gun that was recovered by police.  (*Id.* at 1-2.)  Although this submission was filed well beyond the time limit allowed under the Court's briefing schedule, the Court has nonetheless considered it out of special solicitude to the *pro se* Plaintiff.   As of the date of this Decision and Order, Plaintiff has not filed an opposition memorandum of law or a response to Defendants' Statement of Material Facts.

## II.  GOVERNING LEGAL STANDARDS

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[2]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.  In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).[3]

---

[2]  As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[3]  Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[4]  (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[5]  As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[6]  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that

---

[4]     *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[5]     *Cusamano*, 604 F. Supp.2d at 426 & n.3 (citing cases).

[6]     *Cusamano*, 604 F. Supp.2d at 426-27 & n.4 (citing cases).

statement–even where the non-movant is *pro se*.[7]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[8]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at \*1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at \*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.    ANALYSIS

### A.    Whether There Exists a Genuine Dispute of Material Fact as to Plaintiff's Claims Against Defendants Ettinger and Decker

After careful consideration, the Court answers the above question in the negative for the reasons stated in Defendants' memorandum of law.  (Dkt. No. 52, Attach. 32, at 9-18, 20-21, 25 [Defs.' Mem. of Law].)  To those reasons, the Court adds the following analysis.

---

[7]        *Cusamano*, 604 F. Supp.2d at 427 & n.6 (citing cases); N.D.N.Y. L. R. 7.1(a)(3).

[8]        *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at \*27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at \*3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

**1.      Claims of Excessive Force, Assault, and Battery**

As Defendants state, courts in this Circuit have recognized that "'[f]ederal excessive force claims and state law assault and battery claims against police officers are nearly identical'" in that the plaintiff must "ultimately demonstrate that the defendant's use of force was 'objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 491 (N.D.N.Y. 2017) (Hurd, J.) (quoting *Graham v. City of New York*, 928 F. Supp. 2d 610, 624 [E.D.N.Y. 2013]; *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 519 [S.D.N.Y. 2013]).  The review of whether the use of force was objectively reasonable is guided by certain factors, including (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect posed an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).  The Court is required to evaluate the record "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,'" and "'granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable.'" *Hulett*, 253 F. Supp. 3d at 491-92 (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 [2d Cir. 2004]).  The use of deadly force is objectively reasonable where an officer had "'probable cause to believe that [defendant] pose[d] a significant threat of death or serious physical injury to [himself] or others.'" *Costello v. Town of Warwick*, 273 F. App'x 118, 119 (2d Cir. 2008) (quoting *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 [2d Cir. 2003]).

Here, the undisputed evidence establishes that Defendant Ettinger's actions in shooting his weapon was objectively reasonable under the circumstances. As discussed above in Part II.B. of this Decision and Order, Defendants were responding to a 911 complaint when they saw a person who appeared to match the description of the subject of that complaint outside of the relevant building (who they observed to be holding a shotgun upon arriving), and saw that same person flee when Defendants approached and continue to flee despite being instructed to stop and drop her weapon. It is also undisputed that Sahlah turned abruptly toward Defendant Ettinger during the flight and he saw that she appeared to be trying to manipulate the safety on the shotgun, which she was holding in both hands. Of note, the only evidence provided by another source who was present during the altercation between Defendants and Sahlah–Mr. Santiago–testified at his deposition that he did not see what Sahlah had been doing in the moments before Defendant Ettinger fired his weapon. (Dkt. No. 52, Attach. 27, at 22-25 [Santiago Dep.].) Given that the undisputed facts that show that Sahlah possessed a shotgun at the time of the incident, that she fled from Defendants and ignored their orders, and that she appeared to be readying to use the shotgun at the time she stopped and turned toward Defendant Ettinger, the Court finds that Defendant Ettinger had probable cause to believe that Sahlah posed a significant threat to the Defendant officers and that there is therefore no genuine dispute of material fact as to whether Defendant Ettinger's actions were objectively reasonable. Consequently, Plaintiff's First, Second, and Third Claims must be dismissed.

### 2. Claim of Denial of Timely and Adequate Medical Care

As this Court has previously noted, the Supreme Court indicated that "'[t]he Due Process Clause . . . require[s] the responsible government or governmental agency to provide medical

care to persons . . . who have been injured while being apprehended by the police.'" *Hernandez v. City of Albany*, 12-CV-1614, 2015 WL 364183, at *11 (N.D.N.Y. Jan. 27, 2015) (Kahn, J.) (quoting *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239 [1983]).  In order to be found to have denied medical care, an officer must (1) know of and disregard an excessive risk to the arrestee's health or safety, (2) be aware of facts from which an inference could be drawn that there is a substantial risk of harm, and (3) draw such an inference.  *Hernandez*, 2015 WL 364183, at *11 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 [1994]).  In other words, it must be shown that the officer was deliberately indifferent to the plaintiff's medical needs.

The Court finds that the undisputed evidence does not establish that Defendants Ettinger and Decker disregarded Sahlah's health or safety following the shooting, much less displayed deliberate indifference.  According to the surveillance video, the shooting took place at approximately 20:41:43.  (Dkt. No. 52, Attach. 8 [DVD Exhibit G attaching DVD].) Communication logs show that Defendant Ettinger called for an ambulance to be dispatched immediately after the shooting, in the same call in which he reported the incident (occurring between 20:42:10 and 20:42:20); that ambulance was dispatched at 20:43:58 and arrived at the scene at 20:46:36.  (Dkt. No. 52, Attach. 7, at 2.)  Consequently, the evidence establishes that Defendant Ettinger called for an ambulance approximately 27 to 37 seconds after the shooting occurred and that the ambulance arrived on scene approximately four-and-a-half minutes after Defendant Ettinger called in the incident.  In addition to this quick action in calling an ambulance, the undisputed evidence also indicates that Defendant Ettinger administered pressure to Sahlah's wounds to staunch her bleeding until trained individuals arrived on scene.  These facts do not show deliberate indifference to Sahlah's need for medical attention and therefore

Plaintiff's Eighth Claim must also be dismissed.[9]

### 3. Doctrine of Qualified Immunity

Because the Court has already determined that Defendants Ettinger and Decker have not committed any violations of Plaintiff's constitutional rights, it need not determine whether Defendants Ettinger and Decker would be entitled to qualified immunity.[10]

### B. Whether There Exists a Genuine Dispute of Material Fact as to Plaintiff's Claims Against Defendant City of Syracuse

After careful consideration, the Court answers the above question in the negative for the reasons stated in Defendants' memorandum of law. (Dkt. No. 52, Attach. 32, at 18-25 [Defs.' Mem. of Law].) To those reasons, the Court adds the following analysis.

### 1. Claim of Municipal Liability

The Court notes as an initial matter that, having already found that the substantive claims underlying the alleged violation of constitutional rights must be dismissed, the Court must also find that Plaintiff's claim of municipal liability against Defendant City of Syracuse must be dismissed. *See Burgess v. DeJoseph*, 725 F. App'x 36, 40 (2d Cir. 2018) (affirming the district court's dismissal of plaintiff's municipal liability claim where the underlying constitutional violations were dismissed); *Gomez v. Cnty of Westchester*, 649 F. App'x 93, 96 (2d Cir. 2016)

---

[9] Plaintiff's arguments regarding the choice of emergency room do not implicate Defendants because it is undisputed that Defendants were not involved in Sahlah's care after paramedics arrived on the scene, and that neither Defendant Ettinger nor Defendant Decker were involved in the decision as to which hospital Sahlah should be taken.

[10] The Court notes that, even if it were to render this determination, it would find that qualified immunity would apply in this case. *See Rose v. City of Utica*, 14-CV-1256, 2018 WL 2041621, at *11-12 (N.D.N.Y. Apr. 19, 2018) (Sannes, J.) (granting qualified immunity where the plaintiff ignored multiple orders to show his hands or drop his shotgun).

("[B]ecause Gomez failed to plausibly allege an underlying constitutional violation, the district court properly dismissed his claims for municipal liability."); *Golian v. New York City Admin. for Chidren Servs.*, 282 F. Supp. 3d 718, 733 n.9 (S.D.N.Y. 2017) (dismissing plaintiff's claim for municipal liability where it had already dismissed the underlying constitutional claim). However, the Court nonetheless makes the following alternative finding to support its dismissal of Plaintiff's *Monell* claims.

Plaintiff's claim that Defendant City of Syracuse should be held liable for the allegedly wrongful acts of Defendants Ettinger and Decker is based primarily on a theory that Defendant City of Syracuse has a *de facto* policy of tolerating the abuse and use of excessive force against members of the African-American community. (Dkt. No. 1, at ¶¶ 68-77 [Pl.'s Compl.].) For prior acts to constitute a *de facto* policy of a municipality, those acts must have been "'sufficiently widespread and persistent.'" *Trombley v. O'Neill*, 929 F. Supp. 2d 81, 94 (N.D.N.Y. 2013) (Suddaby, J.). "[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.3d 119, 123 (2d Cir. 1991); *see also City of Oklahoma City v. Turtle*, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."). Here, Plaintiff's allegations of a *de facto* policy are entirely conclusory and unsupported by any evidence. In particular, although Plaintiff alleges in the Complaint that there have been "frequent instances of false arrests, malicious prosecutions and the use of gratuitous, unreasonable, and excessive force against

members of the African American community" and "frequent complaints against the [Syracuse Police Department] to Internal Affairs and to the Citizens Review Board," Plaintiff offers no evidence to support these allegations. (Dkt. No. 1, at ¶¶ 72, 74 [Pl.'s Compl.].) Without evidence that similar conduct has occurred in the past, the Court cannot say that a reasonable factfinder could conclude that Defendant City of Syracuse was aware of any improper conduct, much less that it essentially adopted that conduct as a *de facto* policy by failing to take remedial action.

Additionally, to the extent that Plaintiff alleges a failure to train or supervise in relation to her *Monell* claim, that theory is also unpersuasive and unsupported. "In order for municipal nonfeasance–e.g., the failure to train, to supervise, or to discipline–to give rise to *Monell* liability, the alleged municipal failure must 'amount[] to deliberate indifference to the rights of persons with whom the [municipal employees] come into contact.'" *Ameduri v. Vill. of Frankfort*, 10 F. Supp. 3d 320, 340 (N.D.N.Y. 2014) (Mordue, J.) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 [1989]). "'Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011). "The operative inquiry is whether those facts demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'" *Cash v. Cnty of Erie*, 654 F.3d 324, 334 (2d Cir. 2011); *see also Benacquista v. Spratt*, 217 F. Supp. 3d 588, 600-01 (N.D.N.Y. 2016) (Hurd, J.) ("'To establish deliberate indifference[,] a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights.'"). As discussed previously, Plaintiff has

not offered any evidence that Defendants Ettinger or Decker had ever previously engaged in similar incidents involving the use of force or the misuse of their firearms, much less evidence that Defendant City of Syracuse was aware or should have been aware of any such incidents. Nor has Plaintiff provided evidence that Defendants Ettinger and Decker received inadequate firearms training. Quite simply, Plaintiff has offered no evidence establishing any prior troublesome conduct, much less that Defendant City of Syracuse was deliberately indifferent to such conduct.

For all of the above reasons, Plaintiff's Seventh Claim must be dismissed.

### 2. Claims of Negligent Hiring, Training, or Retaining and Negligent Entrustment

New York recognizes a tort of negligent hiring and retention, under which an employer may be held liable for the acts of an employee who was acting within or outside of the scope of their employment. *Gonzalez v. City of New York*, 17 N.Y.S. 3d 12, 15 (N.Y. App. Div. 1st Dep't 2015). "The negligent retention or supervision of a police officer, which results in the employee having possession of a dangerous instrumentality, is similar to if not distinguishable from the tort of entrusting a dangerous instrumentality to another," and thus, "[t]he duty analysis should be the same." *Gonzalez*, 17 N.Y.S. 3d at 15. In particular, a person who entrusts another with an instrumentality will be subject to liability for resulting harm where they know or have reason to know that the other person will use the instrumentality in a manner involving unreasonable risk of physical harm to himself or others as a result of youth, inexperience or otherwise. *Id.* New York courts have explicitly extended this theory of liability to police officers who are known to be violent who are put in positions in which they can harm others. *Id.* at 16.

Here, Plaintiff has offered no evidence that either Defendant Ettinger or Defendant Decker had a history of violent incidents or that they were inexperienced with using their firearms such that entrusting them with firearms involved an unreasonable risk of harm to others. Without any evidence that these Defendants had a history or propensity for harmful conduct, Plaintiff simply cannot establish that Defendant City of Syracuse was negligent in hiring, training, or retaining Defendants Ettinger and Decker or in entrusting them to use departmentally issued firearms. Consequently, Plaintiff's Fourth and Fifth claims must be dismissed.

### 3.     Claim of Wrongful Death

Pursuant to New York law, in order to succeed on a claim for wrongful death, the decedent's personal representative must show the following four elements: "(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent." *Zikianda v. Cnty of Albany*, 12-CV-1194, 2015 WL 5510956, at *60 (N.D.N.Y. Sept. 15, 2015) (McAvoy, J.) (quoting *Chong v. New York City Transit Auth.*, 441 N.Y.S. 2d 24, 25-26 [N.Y. App. Div. 2d Dep't 1981]); *see also Eberts v. Makarczuk*, 861 N.Y.S. 2d 731, 732 (N.Y. App. Div. 2d Dep't 2008) ("To succeed on a cause of action to recover damages for wrongful death, the decedent's personal representative must establish, inter alia, that the defendant's wrongful act, neglect, or default cause the decedent's death.").

In her Complaint, Plaintiff alleges that the wrongful act causing Sahlah's death was Defendant City of Syracuse's negligent, reckless, and intentional provision of firearms and a license to carry firearms to Defendants Ettinger and Decker "without proper consideration of

their qualifications to carry firearms and without proper training to use firearms judiciously and only when necessary." (Dkt. No. 1, at ¶¶ 64-67 [Pl.'s Compl.].) However, as already discussed with relation to the other state law claims against Defendant City of Syracuse, Plaintiff has failed to provide any evidence to support this claim, and, in fact, testified at her deposition that she is not alleging that Defendant City of Syracuse was aware of anything in either Defendant Ettinger's or Defendant Decker's background that would render their possession of firearms unsafe. *See* Part II.B., ¶¶ 112-18 of this Decision and Order.[11] Consequently, Plaintiff's Sixth Claim for wrongful death must be dismissed.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 52) is

**GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

Dated: February 1, 2019
      Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge

---

[11]      Even giving Plaintiff the benefit of the doubt and assuming that the wrongful death claim is also asserted against Defendants Ettinger and Decker for their individual acts on February 12, 2016, the Court has already found that Plaintiff's other claims against those Defendants must be dismissed. Because the use of excessive force, assault, battery, and failure to provide timely and adequate medical care would be the only alleged actions of those Defendants that would have caused Plaintiff's death, the dismissal of those claims would also require the dismissal of any wrongful death claims against Defendants Ettinger and Decker due to Plaintiff's inability to establish a wrongful act.